**IT IS SO ORDERED.**

**SIGNED THIS: March 5, 2024**

_____

**Mary P. Gorman**
**United States Bankruptcy Judge**

_____

UNITED STATES BANKRUPTCY COURT

CENTRAL DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| In Re | ) | |
| | ) | Case No.    22-70235 |
| WHITNEY J. HARDING, | ) | |
| | ) | Chapter 7 |
| Debtor. | ) | |

## O P I N I O N

Before the Court after trial are the Chapter 7 Trustee's Motion for Turnover Order (#106) and his Objection to Debtor's Amended Claim of Exemptions (#113). For the reasons set forth herein, both the Trustee's Motion and Objection will be allowed, in part. The Debtor will be ordered to turn over the nonexempt portion of insurance proceeds received for her personal property lost in a postpetition fire.

## I.        Factual and Procedural Background

The issues before the Court represent the latest installment in an ongoing dispute between the Debtor and the Chapter 7 Trustee regarding whether and to what extent the Debtor has removed insurance proceeds received on account of personal property lost in a postpetition fire from the bankruptcy estate by her claim of exemptions. The Court previously entered an order limiting the Debtor's original claim of exemptions in personal property to the amounts claimed rather than the amounts received in insurance proceeds, setting forth detailed findings in an opinion entered August 25, 2023. *In re Harding*, 2023 WL 5525039, at *1 (Bankr. C.D. Ill. Aug. 25, 2023). The facts and circumstances underlying the Trustee's current Motion for Turnover and Objection to Debtor's Amended Claim of Exemptions follow from the facts and circumstances upon which that decision was based. That history is summarized herein.[1]

The Debtor, Whitney J. Harding, filed her voluntary Chapter 7 petition on April 20, 2022. In scheduling her personal property, she lumped practically all her personal property into the broad categories of "Household Goods" valued at $450 and "Electronics" valued at $400. She did not separately schedule ownership of any furniture, collectibles of value, jewelry, or other insurance policies. A few days after her bankruptcy case was filed, the Debtor suffered a fire at her apartment resulting in a total loss of most of her personal property. The Debtor filed an insurance claim, creating a detailed itemization of the

---

[1] To the extent facts and findings repeated here differ from those set forth in the August 25th opinion, the facts and findings in the August 25th opinion shall control. Fed. R. Bankr. P. 7052.

property that was lost. When the Chapter 7 Trustee learned that the Debtor had received more than $26,000 in insurance proceeds, he filed his objection to the Debtor's original claim of exemptions. That objection resulted in the prior decision limiting the Debtor's exemption in insurance proceeds traceable to "Household Goods" and "Electronics" to the total amount of $850 claimed in her schedules.

This Court found that, in using two broad categories to describe her personal property, the Debtor failed to disclose her property in sufficient detail to be able to trace any particular item to any particular amount of insurance proceeds received for its loss in the fire. Further, the manner in which the Debtor scheduled her personal property left the Trustee without the relevant information needed to evaluate her claims of exemption; the Court explained that, under controlling precedent, the Debtor's "categorical claim[s] of exemption should not be honored beyond the value [she] attached to the categor[ies]." *Id.* at *5 (quoting *Payne v. Wood*, 775 F.2d 202, 206 (7th Cir. 1985)). Explaining that its decision was without prejudice to the Debtor filing amended schedules, the Court cautioned that any amended schedules filed would need to include a detailed itemization, would be subject to challenge by the Trustee for accuracy, and that the burden would be on the Debtor to justify the values she used if challenged.

On September 20, 2023, following entry of the opinion and order limiting the Debtor's claims of exemption, the Trustee filed his Motion for Turnover Order for the $13,618.14 that he calculated as the nonexempt portion of

insurance proceeds received by the Debtor on account of the apartment fire. To reach that amount, the Trustee explained that he deducted the $850 allowed exemptions from $14,468.14—the actual cash value of the Debtor's lost personal property, according to the itemized proposal prepared by the insurance company, less amounts attributable to food and clothing that were not at issue.

A week later, the Debtor filed her Amended Schedule A/B: Property and Amended Schedule C: The Property You Claim as Exempt. The amended schedules listed "Household Goods" and "Electronics" with aggregate values of $494 and $720, respectively; unlike the Debtor's original schedules, the amended schedules contained itemized lists and values of the individual items within each category. The Debtor claimed items within these categories exempt in their scheduled amounts.[2] Among the items listed on her Amended Schedule A/B, the Debtor also scheduled ownership of jewelry she valued at $50 and used makeup, toiletries, and food she valued at $0, neither of which she claimed exempt on her Amended Schedule C.

The Trustee filed his Objection to Debtor's Amended Claim of Exemptions on October 23, 2023. The Objection complained that the Debtor continued to undervalue her household goods and electronics despite significantly higher values having been established through the insurance

---

[2] It appears the Debtor attempted to copy the itemized lists provided at subparagraphs 6 and 7 of Part 3 of Amended Schedule A/B and paste them to her Amended Schedule C, but several items were cut off in the process and do not specifically appear on the Amended Schedule C. The total amounts claimed exempt, however, match the aggregate values asserted by the Debtor on Amended Schedule A/B. The exemptions were claimed under the Illinois wild card exemption provision. *See* 735 ILCS 5/12-1001(b).

claim process and asked that the Court use the actual cash values from the insurance settlement as the value of the Debtor's personal property on the date of filing. Attached to the Objection was a spreadsheet prepared by the Trustee matching and comparing the itemized household goods and electronics listed and valued by the Debtor in her amended schedules to items submitted in support of her insurance claim and their actual cash values as calculated and paid by the insurance company.

An evidentiary hearing on the Motion and Objection was held November 27, 2023. The Debtor was the only witness to testify. Walking through the itemization spreadsheet attached to his Objection, the Trustee asked the Debtor how she valued her property in amending her schedules. Beginning with the "office chair" valued at $15 on her amended schedules, the Debtor confirmed that it represented the "Serta office chair" identified in her insurance claim for which she was paid an actual cash value of $163.78 from the insurance company. As for the discrepancy in value between the two, the Debtor maintained that her scheduled value was based on what she believed the chair would sell for in a garage sale despite having received more than 10 times that amount from the insurance company. Next, the Debtor agreed that the "storage bags" she scheduled at a value of $2 represented the "Ikea storage bags" for which she received $54.28—more than 25 times the scheduled value. As the Trustee went through his itemization, he asked the Debtor whether she disagreed with how he matched the scheduled items with those detailed in the insurance documents; at no point did she express any disagreement.

The Trustee repeatedly questioned the Debtor about the fact that the insurance company's actual cash value for many items was 10, 20, even 50 times the values she scheduled. In response, the Debtor repeatedly said that she was using garage sale values and that she had not considered the values set by the insurance company.[3] When asked about the "3 comforters" scheduled at a value of $2, the Debtor acknowledged receiving $224 from her insurer on account of their actual cash value and clarified that her $2 valuation was per item or $6 for all three comforters. When pressed about selling them at a garage sale for $2 each, the Debtor said she believed someone would buy them for that price but that she would not sell them at that price. She said the same was true for other items listed: they were worth more to her than the garage sale values she assigned to them.

Although the Trustee did not go through every item individually in his spreadsheet, the Debtor was repeatedly asked to review and confirm whether the Trustee had properly matched up the items listed in her amended schedules with those on the insurance itemization. The Debtor did not take issue with how the items were paired. A few of the most notable comparisons were highlighted by the Trustee. The Debtor scheduled "tumblers" valued at $5 which encompassed a "Stanley tumbler w/ handle," "Yeti 30 oz travel mug," "Swig tumblers," and a "Yeti can insulator" for which the Debtor received a total of approximately $225 from her insurance company. The Debtor also scheduled "bakeware, pots/pans, silverware" valued at a total of $5. Those

---

[3] During his questioning of the Debtor, the Trustee offered that he was only objecting to exemption of items for which the insurance value was more than 4 times the scheduled value, which, it turns out, was most of the items.

items were linked to several sets of cooking and bakeware, cooking utensils, knives, and silverware described more particularly in the insurance itemization on account of which she was paid $564.80. Similarly, the "serving bowl, casserole dish" scheduled as being worth $2 included three Corningware casserole dishes, a Fiestaware serving bowl, and a set of Fiestaware mixing bowls with actual cash values totaling $260.25. Three lamps the Debtor valued at $15 actually consisted of six, relatively new floor and table lamps for which the Debtor received $826.36.

The Debtor also acknowledged the jewelry she scheduled but did not claim exempt, asserting under questioning by her attorney that she did not claim an exemption because she failed to disclose the jewelry in her original schedules. She also acknowledged that she scheduled "used makeup and toiletries, food" valued at $0 without claiming the items exempt. And the Debtor did not dispute the Trustee's representation that the amounts received for her lost makeup and toiletries, as well as several household goods, furnishings, and electronics not included in her amended schedules, was in excess of $2000.

Following the Debtor's testimony, the attorneys argued their respective positions. The Trustee acknowledged that the insurance values were not representative of what he might have obtained by liquidating the property. Even so, he argued that the insurance values were the only reference point for assessing value—the Debtor's garage sale values were not even close to being an accurate measure of value. He further condemned the Debtor's failure to

meaningfully describe her property despite having had multiple opportunities to do so, as well as her omission of several items and failure to claim exemptions in some of the items that were included. He argued that, under the circumstances, the insurance values were the best measure of value for the property relating to his Objection.

The Debtor's attorney argued that his client tried to give an honest valuation of her personal property if it had it not been destroyed in the fire. He said the insurance numbers were arbitrary and not an accurate measure of reality. As for why certain property, namely "used makeup and toiletries, food," was not claimed exempt, he said it was because the property was worth nothing. When the Court questioned whether the Debtor would be entitled to keep insurance proceeds traceable to property that she did not claim exempt, her attorney said he did not believe the items were the type that the Trustee would administer. He asserted, however, that it would be only fair for the Debtor to have yet another opportunity to amend her schedules.

The Court explained that the Debtor was not prohibited from amending her schedules but questioned why amendments were not made previously. The Court strongly encouraged the Debtor and her attorney to file any further amendments sooner rather than later. The matter was taken under advisement. More than two months later, on February 8, 2024, the Debtor filed amended schedules purporting to itemize and exempt every item of personal property lost in the apartment fire. The Court was preparing to issue its decision when the amendments were filed. The amendments therefore did not

affect the Court's decision and are given only passing consideration in this Opinion.[4] The matter is now ready for decision.

## II.    Jurisdiction

This Court has jurisdiction over the issues before it pursuant to 28 U.S.C. §1334. All bankruptcy cases and proceedings filed in the Central District of Illinois have been referred to the bankruptcy judges. CDIL-Bankr. LR 4.1; *see* 28 U.S.C. §157(a). Matters involving the exemption of property from a bankruptcy estate are core proceedings. 28 U.S.C. §157(b)(2)(B). This matter arises from the Debtor's bankruptcy itself and from the provisions of the Bankruptcy Code and may therefore be constitutionally decided by a bankruptcy judge. *See Stern v. Marshall*, 564 U.S. 462, 499 (2011).

## III.    Legal Analysis

As with the prior dispute, the outcome of the present dispute is largely controlled by the Seventh Circuit's decision in *Payne v. Wood*. The Debtor's bankruptcy estate includes not only her interest in property at the time of filing but also any proceeds therefrom. 11 U.S.C. §541(a)(1), (6). Property may be removed from the estate by claiming the property exempt, but nonexempt property remains in the estate for the benefit of creditors. *Payne*, 775 F.2d at 204. It does not matter whether the property later changes form; insurance

---

[4] As of the date of this Opinion, the Trustee has a few days left to file any objection he has to the latest amendments. Until the Court knows whether he is going to object and what his objections might be, the matter is not one for the Court to assess or resolve.

proceeds traceable to estate property remain estate property and are exempt to the extent traceable to properly exempted property. *Id.*; *In re Stinnett*, 465 F.3d 309, 312-13 (7th Cir. 2006) (citations omitted).

This Court previously decided that, under *Payne*, the Debtor's scheduling of her personal property and claiming it exempt in generic, categorical terms was insufficient to provide adequate notice of what was being claimed exempt or to put the Trustee on notice of the wisdom of further inquiry. *Harding*, 2023 WL 5525039, at *4-6 (citing *Payne*, 775 F.2d at 204-06). As a result, the insurance proceeds the Debtor received on account of her personal property lost in the apartment fire could not be traced to her claimed exemptions and her interest in the proceeds was necessarily limited to the dollar amounts claimed. *Id.* In issuing its earlier decision, the Court made clear that the Debtor was not precluded from filing amended schedules but also that any such amendments needed to be accurate and provide enough detail for the Trustee to evaluate them. *Id.* at *6. And while the Debtor was free to value her property as she deemed appropriate, the Court also cautioned that using overly discounted values would surely draw scrutiny, putting the burden on the Debtor to justify her valuations. *Id.* The issues to be decided now are whether the Debtor's amended schedules supply enough detail to provide adequate notice of what property she claims exempt, and, relatedly, how her valuation of the property affects that outcome. The burden of proof on these issues rests with the Debtor. *Id.* at *4-6 (citations omitted).

As a preliminary matter, it is important to head off any potential misunderstanding about the Court's findings. The Trustee's Objection was based largely on the stark difference between the Debtor's valuation of her property and the actual cash values determined by her insurance company for purposes of settling her loss claim. As the Court previously explained, the amount an insurance company pays on account of a loss claim is not the same as the value the Trustee might have obtained through liquidation had the property not been destroyed. To the extent the Trustee believes the insurance values were the proper measure of value for the Debtor to use on her amended schedules, he failed to provide any authority for that proposition. Thus, under the circumstances before it, the Court cannot and does not find that the insurance values dictate how the Debtor's property should be valued on her amended schedules.

That said, the insurance claim and resulting payout are certainly relevant to the Court's inquiry regarding the adequacy of the Debtor's schedules. Having taken all evidence into account, the Court concludes that the Debtor failed to provide enough detail in her amended schedules to give objectively adequate notice of what property she actually claimed exempt and therefore what insurance proceeds might also be exempt as being directly related to the loss of an exempt item of property.

Under ordinary circumstances, the Debtor's itemization of her household goods and electronics in her amended schedules might have been sufficient. After all, "[i]t would be silly to require a debtor to itemize every dish and fork,

even to list the electric knife separately from the crock pot." *Payne*, 775 F.2d at 205. The degree of specificity required will depend on information available to a debtor and whether it might be helpful to the trustee; this includes information about value. *Id.* at 205-06.

This case, however, presents a unique situation in that nearly all the Debtor's personal property was destroyed in a fire just days after filing bankruptcy. That occurrence led to her submission of a detailed insurance claim, complete with information about the brand, model, and age of every item of property lost. The insurance company, in turn, calculated actual cash values for the property items based on the information provided by the Debtor and, for all practical purposes, paid those amounts to the Debtor in settlement of her claim.[5] Despite having this information, the Debtor has declined to use it in any meaningful way in her amended schedules and amended claim of exemptions.

At trial, the Trustee highlighted the disparity of detail between the amended schedules and the insurance documents. In all but a few instances, the Debtor did not describe her personal property by brand name, model, age, or identifying features in her amended schedules; the itemization she submitted to her insurance company, on the other hand, described the property in great detail. For instance, the Debtor scheduled "tumblers" worth $5 but for insurance purposes claimed a "Stanley tumbler w/ handle" valued at $86.20, a "Yeti 30 oz travel mug" valued at $76.93, "Swig tumblers" valued

---

[5] As is detailed in the Court's earlier decision, the Debtor was paid replacement cost value for a select few items in lieu of actual cash value. That fact is not germane to the present discussion.

at $23.82, and a "Yeti can insulator" valued at $37.72. And although debtors ordinarily would not be expected to describe every item of property down to the smallest detail, a greater degree of specificity was necessary in this case because the details about brand name or key features of specific items had already been compiled for insurance purposes and those details were instructive of value in bankruptcy. *See Payne*, 775 F.2d at 205-06. The Debtor's description in her amended schedules of "tumblers" worth $5 obscured relevant information about the number and value of the items it was intended to encompass and "forestalled an inquiry [she] knew lay in store." *Id.* at 206 (concluding that the legal result of debtors omitting details from schedules that they knew would be relevant to trustee was a limitation on the value they could receive for the assets).

Similarly, the Debtor's disclosure of "bakeware, pots/pans, silverware" valued at a total of $5 gave the impression that she owned a few modest kitchenware items that were perhaps old or cobbled together to make a set. In no way did her disclosure convey ownership of complete sets of cookware, bakeware, silverware, knives, and utensils, as well as other assorted dishes, for which the insurance company paid her $564.80. Had the Debtor described her property with greater accuracy or assigned a higher value to various categories, such additional information might have been enough to inform the Trustee of the wisdom of further inquiry. But, as scheduled, the Debtor's amended disclosure and claim of exemption in "bakeware, pots/pans, silverware" at less

than 1% of the value she received for the items within the category is inadequate. *Id.* at 205-06.

In some instances, the Debtor's lack of precision in her amended schedules approached the line of deception. She listed and claimed exempt what she described as "serving bowl, casserole dish" worth $2. But at trial the Debtor agreed the disclosure was intended to cover not one but three Corningware casserole dishes, a Fiestaware serving bowl, and a set of Fiestaware mixing bowls with actual cash values totaling $260.25. The Debtor also listed three lamps that she valued at a total of $15, but at trial she did not dispute the Trustee's assertion that that the three lamps disclosed actually consisted of six, relatively new floor and table lamps for which she received $826.36. Again, scheduling these items at pennies on each dollar actually received for them was not adequate. *Payne*, 775 F.2d at 205-06. Further, listing three lamps and a single bowl and dish simply did not provide notice of exemption claims in six lamps and entire sets of bowls and dishes. *See In re O'Malley*, 633 B.R. 332, 346 (N.D. Ill. 2021) (listing of one item does not give notice of two). And because the amended schedules do not identify any specific bowl, dish, or lamp, it is impossible to trace insurance proceeds to a particular bowl, dish, or lamp for exemption purposes.

The Debtor's amended schedules simply did not provide notice of what she was claiming exempt. Despite providing more detail than her original schedules, the Debtor's amended schedules are still ambiguous and value her property at a fraction of what was paid on her insurance claim while omitting

information relevant to the issue. As a result, the Court cannot determine, on the face of the schedules, what items were or were not claimed as exempt, and the Debtor's exemption in proceeds must be limited to the values she assigned in her amended schedules. *Payne*, 775 F.2d at 206-07; *cf. O'Malley*, 633 B.R. at 347 (unchallenged claim of exemption clearly covered traditional pension plan but not interest in additional, undisclosed auxiliary plan; auxiliary plan automatically passed into bankruptcy estate).

The inadequacy of the Debtor's amended schedules to provide notice of what property was claimed exempt is made worse when considered from the perspective of determining what property was not claimed exempt. In addition to the property already discussed, the Debtor scheduled her interest in "used makeup and toiletries, food" and valued it all at $0. The Debtor acknowledged that the disclosure encompassed an extensive list of makeup and toiletry items for which she received insurance proceeds, but she also conceded that she did not claim the property or proceeds exempt. Similarly, the Debtor admitted that her disclosures did not cover several other items that, having not been scheduled, could not have been claimed exempt. The Trustee's spreadsheet highlights several examples of items that were not scheduled, including furniture, books, collectibles, and other household items, but the breadth of the Debtor's failure to disclose is not fully known. Although the Trustee expended great effort to trace and compare the Debtor's amended schedules with the insurance records, it is not clear what has or has not been scheduled. Because essentially all the Debtor's personal property was converted to

insurance proceeds after filing, the inability to determine what property was not claimed exempt further frustrates an objective determination of what portion of the insurance proceeds were removed from the estate by the exemptions she did claim.

Debtors have sole control over the drafting of their schedules, including their claims of exemptions. But because property not claimed exempt passes to the estate automatically, the burden of making clear what property is being claimed exempt necessarily rests entirely with debtors. *Payne*, 775 F.2d at 206. Whether a debtor meets their burden is an objective determination, based on the face of their schedules. *See Schwab v. Reilly*, 560 U.S. 770, 788-90 (2010); *Payne*, 775 F.2d at 206; *O'Malley*, 633 B.R. at 346. When it is not clear, doubts must be resolved in favor of the estate. *Id.*; *see also In re Bauman*, 2014 WL 816407, at *12 (Bankr. N.D. Ill. Mar. 4, 2014) (absent enough detail, debtor deemed not to have claimed exemption) (citations omitted). To hold otherwise would be to give credence to the subjective intentions of debtors and "encourage the making of excessively general claims in the hope that if omissions should be discovered, the debtors could argue that the omitted property was 'really' in some broadly worded category." *Payne*, 775 F.2d at 206. The Debtor's amended schedules did not make evident—given the information available and traceability concerns involved when assets are converted to cash proceeds—what property was or was not being listed and claimed exempt. As a result, the Debtor's amended claims of exemption at issue here are properly

limited to the values she assigned them. *Id.* at 206; *see also In re Rosenzweig*, 245 B.R. 836, 841 (Bankr. N.D. Ill. 2000).

Even if subjective intentions were relevant to the inquiry, the Debtor's testimony was not credible. She said she valued her personal property as if being sold at a garage sale. When pressed about insurance proceeds paid in amounts many times higher than the values she listed for specific items, she maintained that she used garage sale values without consideration of the amounts paid by the insurance company. When asked about the "3 comforters" she valued at $2 despite receiving $224 from the insurance company, the Debtor tried to justify the vast discrepancy in value by explaining that the $2 value used on her amended schedules was per item—not $2 for all three. Her assertion was just not credible. The comforters were listed with a $2 value and included in the aggregate value of $494. Changing the $2 value for three comforters to $6 would result in a different aggregate total and make the Debtor's amended schedules inconsistent. The Debtor's testimony is simply not supported by the information plainly set forth in her amended schedules.

Further, in discussing the value of the comforters, the Debtor said she believed that someone would be willing to buy them at that price but admitted that she would not be willing to sell them at a garage sale for the amount listed. In response to follow-up questioning by the Trustee, she said she would not sell any of her property at a garage sale and agreed that her personal property was worth more to her than the garage sale values she assigned to the items. The Debtor's testimony undercuts the trustworthiness of her use of

purported garage sale values. If the Debtor would not willingly sell her property for the amounts listed, the idea that a prospective buyer would be willing to pay bottom dollar for the property is meaningless.

Official Form 106A/B, commonly known as Schedule A/B: Property, asks debtors to list their property interests and to report the "current value" of those interests. The instructions to Official Form 106A/B explain that "current value" is simply "how much the property is worth" and is synonymous with "fair market value." Further, §522(a)(2) defines "value" for exemption purposes as "fair market value," and that term is commonly understood to be "[t]he price that a seller is willing to accept and a buyer is willing to pay on the open market and in an arm's-length transaction." *In re Valentine*, 2009 WL 3336081, at *8 (Bankr. D.N.H. Oct. 14, 2009) (quoting BLACK'S LAW DICTIONARY 1691 (9th ed. 2009)).

Courts have long been divided about whether the "fair market value" standard encompasses or prohibits the use of liquidation or distressed-sale values on bankruptcy schedules. *Id.* (citing *Harker v. West (In re West)*, 328 B.R. 736, 750 n.8 (Bankr. S.D. Ohio 2004) (surveying cases)). In its previous decision in this case, the Court explained that the Debtor was not bound by any prescribed valuation standards and could value her property by whatever standard she deemed appropriate subject to her being able to justify her methods. *Harding*, 2023 WL 5525039, at *6 n.5. The instructions to Official Form 106A/B similarly encourage debtors to estimate values in the absence of information on value from reputable sources but to be prepared to explain how

they determined those values. Here, the Debtor declined to use relevant information readily available to her in drafting her amended schedules and failed to provide a meaningful explanation for scheduling and valuing her property in the manner that she did.

The Debtor's testimony was that she did not consider the insurance information that was readily available to her. Although the Debtor's attorney was correct that the insurance numbers were calculated and compiled for a different purpose, the numbers and other information in the insurance documents were relevant and should have been used for guidance in listing, describing, and valuing her property in her amended schedules. Her failure to take the insurance information into account when valuing the property calls the trustworthiness of her valuation into question.[6] In the same vein, the Debtor's bald assertion that she used garage sale valuations at the direction of her attorney is not enough to explain the huge discrepancy in detail and amount between her amended schedules and her insurance claim. *See In re Smith*, 2017 WL 2791390, at *4 (Bankr. N.D. Miss. June 27, 2017) (debtor not

---

[6] Many courts have found that a debtor's failure to consider relevant information of which they are specifically aware when valuing property in bankruptcy schedules is problematic in the context of proceedings to deny or revoke the debtor's discharge under §727. *See, e.g., Neary v. Darby (In re Darby)*, 376 B.R. 534, 538-541 (Bankr. E.D. Tex. 2007) (discharge revoked for fraudulent scheduling and undervaluing of assets, including paintings she valued at $1000 which were previously appraised for $12,000 and subsequently sold for $175,000); *IBA, Inc. v. Hoyt (In re Hoyt)*, 337 B.R. 463, 470-71 (Bankr. W.D.N.Y. 2006) (although discharge denied on other grounds and despite apparent confusion about proper valuation standards, large discrepancy between scheduled values and values asserted in financial statement submitted to lender just days before bankruptcy was problematic, should have led debtor to question propriety of scheduled values, and demonstrated a pattern of debtor's failure to completely and accurately disclose assets and their values); *United States Trustee v. Eppers (In re Eppers)*, 311 B.R. 826, 833 (Bankr. D.N.M. 2004) (scheduling property at value of $1 when just months prior debtor was in negotiations to sell property at estimated $20,000 profit was misleading and inexcusable).

entitled to full proceeds of insurance settlement on account of postpetition property loss at 10 times value scheduled and claimed exempt because, even assuming different valuation standards, such a large discrepancy suggested significant undervaluation in sworn schedules); *see also JP Morgan Chase Bank, N.A. v. Koss (In re Koss)*, 403 B.R. 191, 213-15 (Bankr. D. Mass. 2009) (debtor made false oath and could not hide behind attorney advice to use garage sale values in scheduling personal property at $12,500 when he previously valued the property at $300,000 in financial statements to lender and was subsequently paid insurance proceeds of $400,000 for property lost in fire).[7]

The Debtor made little effort to explain how she valued her property beyond asserting that she used garage sale values at the direction of her attorney. What explanation she did provide was not credible or otherwise raised doubts about the trustworthiness of her methods. Even if it were clear what property the Debtor was claiming exempt, her failure to justify the values assigned would lead to the same result. *See Payne*, 775 F.2d at 206 ("[a] court

---

[7] As previously noted, large, unjustified discrepancies between scheduled values in bankruptcy and values later submitted for insurance purposes may also serve to limit recovery in subsequent insurance claim litigation. *Harding*, 2023 WL 5525039, at *6 n.5 (citing *Neidenbach v. Amica Mut. Ins. Co.,* 96 F. Supp. 3d 925, 935 (E.D. Mo. 2015)); *see also Rizka v. State Farm Fire & Cas. Co.,* 2015 WL 9314248, at *11 (E.D. Mich. Dec. 23, 2015) (intent to defraud found as matter of law where (1) "extreme" "dollar disparities" between value of personal property for insurance claim and that of recently-filed bankruptcy schedules and (2) insured offers no reasonable explanation for the disparity), *aff'd*, 686 Fed. App'x 325 (6th Cir. 2017); *Bruegge v. Metro. Prop. & Cas. Ins. Co.,* 2015 WL 738672, at *3-4 (S.D. Ill. Feb. 19, 2015) (although attorney instruction to list property on bankruptcy schedules at 20 times less than actual worth might innocently explain some discrepancy in value, it was apparent schedules did not account for all property subsequently listed for insurance claim and total insurance value 100 times schedules was so vastly different that it could not be attributed to simple difference in valuation methods for different purposes).

may not let the debtor be the sole estimator of market value"); *Smith*, 2017 WL 2791390, at *4 (absent credible explanation, large discrepancy in value between schedules and available information suggests significant undervaluation of property). If the Debtor would not sell her property for the amounts she listed, it is not reasonable for her to ask this Court to believe that the values she listed are legitimate values for her property. Although the Trustee failed to show that the insurance values were an accurate measure of value for the Debtor's property on the petition date, he did highlight the disparity between the insurance claim values and the amended schedules. That shifted the burden to the Debtor to justify her values; she failed to meet that burden.

## IV.   Conclusion

The Debtor lumping all her property into two generic categories in her original schedules was itself inadequate even without the added circumstance of the apartment fire and resulting insurance claim. But once she had expended the effort to itemize and value her property in connection with her insurance claim, she had an affirmative duty to amend her bankruptcy schedules to incorporate the information of which she had become acutely aware and to describe her property interests in greater detail. Whether, at that time, she needed to list every "fork and dish" the Court need not decide because she declined to amend her schedules—other than to list the insurance policy she previously had not disclosed—until more than a year after the

Trustee objected to her original claims of exemption. Only after a protracted discovery period, a trial, the Court's decision limiting her exemptions to the amounts claimed, and the Trustee's subsequent effort to enforce the decision through his Motion for Turnover did the Debtor finally amend her schedules to provide additional details about her property. But even then, she largely ignored the Court's prior admonitions and wholly ignored relevant information on value in a half-hearted effort to itemize only a portion of the property lost in the fire.

Both the Trustee and the Court have expended significant energy and resources to bring the Debtor's attention to the inadequacies of her disclosures. Her continued failure to cure those inadequacies has only become more and more suspect with the passage of time. As noted, the Debtor just recently filed another set of amended schedules, this time purportedly itemizing all her lost property. But she continues to use bottom dollar values for which she previously admitted she would not sell her property. The slow drip of additional detail with each successive amendment displays a concerning pattern in the Debtor's failure to completely and accurately disclose her property interests and their values. *Hoyt*, 337 B.R. at 470-71.

Of course, the Debtor's latest amendments are not before the Court. The exemptions and values claimed therein will be evaluated in due course if the Trustee chooses to object. But the recent filing of amended schedules cannot further delay the turnover of insurance proceeds sought by the Trustee and to which he is entitled. The Trustee's Motion for Turnover calculated the actual

cash value of the Debtor's lost property at issue, less amount attributable to food and clothing, to be $14,468.14. After deducting $494 and $720 to account for the allowed amounts of exemptions claimed in household goods and electronics, $13,254.14 remains and shall be turned over to the Trustee. How the allocation of proceeds ordered to be turned over will be affected by the latest amended schedules is a separate dispute for another time and may depend on events that have yet to occur.

This Opinion is to serve as Findings of Fact and Conclusions of Law pursuant to Rule 7052 of the Rules of Bankruptcy Procedure.

See written Order.

###